# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS - DALLAS DIVISION

| | | |
|---|---|---|
| **HOPPENSTEIN PROPERTIES, INC.** | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **Civ. Action No. 3:21-cv-01172** |
| | § | |
| **CITY OF DALLAS and EDDIE** | § | |
| **GARCIA, in his official capacity as** | § | |
| **Chief of Police,** | § | |
| *Defendants.* | § | |

## APPENDIX OF EXHIBITS

Exhibit A: Report on Joint Interim Study Charge ("Report") ............................2
Exhibit B: Ordinance ........................................... 41
Exhibit C: EFH Notice........................................ 51
Exhibit D: RBL Notice ....................................... 55
Exhibit E: Emergency Motion to Suspend Temporary Injunction ................... 57
Exhibit F: Order granting the Motion ................................ 71
Exhibit G: Proposed TRO ................................... 73

Hoppenstein Properties Inc. v. City of Dallas and Eddie Garcia

# Report on Joint Interim Study Charge to the 80th Texas Legislature



# Committee on
# Criminal Jurisprudence
# & General Investigating and Ethics Committee

### March 2006

**HOUSE COMMITTEE ON CRIMINAL JURISPRUDENCE**
**TERRY KEEL**
**CHAIRMAN**
**&**
**HOUSE GENERAL INVESTIGATING AND ETHICS COMMITTEE**
**KEVIN BAILEY**
**CHAIRMAN**

**TEXAS HOUSE OF REPRESENTATIVES**
**REPORT ON JOINT INTERIM STUDY CHARGE 2006**

**A REPORT TO THE**
**HOUSE OF REPRESENTATIVES**
**80TH TEXAS LEGISLATURE**

**COMMITTEE CLERKS**
**DAMIAN DUARTE and RACHAEL SCHREIBER**
**&**
**ROBERTA BILSKY**



Committee On
Criminal Jurisprudence

February 28, 2006

Terry Keel                                                                P.O. Box 2910
Chairman                                                        Austin, Texas 78768-2910

The Honorable Tom Craddick
Speaker, Texas House of Representatives
Members of the Texas House of Representatives
Texas State Capitol, Rm. 2W.13
Austin, Texas 78701

Dear Mr. Speaker and Fellow Members:

The Committee on Criminal Jurisprudence of the Seventy-Ninth Legislature hereby submits its report on the joint interim study charge with the General Investigating and Ethics Committee pertaining to the use of the nuisance abatement authority by the City of Dallas for consideration by the Eightieth Legislature.

Respectfully submitted,

_____
Terry Keel

_____
Debbie Riddle

_____
Mary Denny

_____
Richard Raymond

_____
Aaron Pena

_____
Paul Moreno

_____
Elvira Reyna

_____
Terri Hodge

_____
Juan Manuel Escobar

Debbie Riddle
Vice Chair

Members: Aaron Pena CBO, Paul Moreno, Mary Denny, Elvira Reyna, Richard Raymond, Terri Hodge, Juan Manuel Escobar



General Investigating and Ethics
Committee

February 28, 2006

Kevin Bailey                                                                          P.O. Box 2910
Chairman                                                                     Austin, Texas 78768-2910

The Honorable Tom Craddick
Speaker, Texas House of Representatives
Members of the Texas House of Representatives
Texas State Capitol, Rm. 2W.13
Austin, Texas 78701

Dear Mr. Speaker and Fellow Members:

The General Investigating and Ethics Committee of the Seventy-Ninth Legislature hereby submits its report on the joint interim study charge with the Committee on Criminal Jurisprudence pertaining to the use of the nuisance abatement authority by the City of Dallas for consideration by the Eightieth Legislature.

Respectfully submitted,

_____
Kevin Bailey

_____
Ken Paxton

_____
Harold Dutton

_____
Terry Keel

_____
Dan Flynn

Ken Paxton
Vice Chair

Members: Harold Dutton, Terry Keel, Dan Flynn

Appendix, p. 5

# HOUSE COMMITTEE ON CRIMINAL JURISPRUDENCE
## &
# GENERAL INVESTIGATING AND ETHICS COMMITTEE

## JOINT INTERIM STUDY CHARGE

*Monitor the use of nuisance abatement authority by the City of Dallas and investigate unresolved issues pertaining to allegations of possible civil rights violations that may have been committed under color of law by local government.*

# TABLE OF CONTENTS

BACKGROUND OF THE ISSUE .................................................................... 1
SUMMARY OF PUBLIC HEARING TESTIMONY ................................................ 3
COMMITTEE RECOMMENDATIONS............................................................ 29
    TESTIMONY AND EVIDENCE ................................................................ 29
    SUMMARY ...................................................................................... 32
    LEGISLATIVE RECOMMENDATIONS ....................................................... 33
    ADDITIONAL ORDER ......................................................................... 34

# BACKGROUND OF THE ISSUE

The legislature has enacted and modified statutes over the years to enable local governments to take appropriate legal action against persons and property owners who tolerate or fail to prevent ongoing criminal activities on their property. Such criminal activities, referred to as common or public nuisances, include, but are not limited to, gambling, prostitution, illicit drug activity and organized crime. Common nuisances are addressed in the Civil Practice and Remedies Code, § 125.0015 (Chapter 125). During the 78th Regular Session, numerous changes were enacted to clarify this law and give municipalities additional tools to combat the two problems that most plague urban communities - drug activity and prostitution. Prior to passage of Senate Bill 1010 (78R), the statutes only allowed proof of *convictions* for crimes committed on a property to constitute *prime facie* evidence that a property owner had knowledge of illegal activities on the property. Passage of that legislation added language to the code to allow, for the first time, proof of *arrests* to also constitute such *prime facie* evidence.

Whenever authority created by the legislature is granted to local governments, it is with the assumption that the new law will be applied within the bounds of existing law and that sound discretion will be applied by local governments in the exercise of that power. However, during the 79th Regular Session, the House Committee on Civil Practices heard lengthy sworn testimony over the course of several weeks from a variety of citizens and business owners regarding misuse of Chapter 125 by the City of Dallas.

It was revealed in testimony that the wording of the statute in effect prior to the 79th legislative session had the unintended consequence of allowing the city to assert that anyone who "knowingly maintained property" was strictly held liable for a crime occurring on that property, even if they were law-abiding citizens who were taking affirmative action to protect themselves and their property from lawbreakers. Another unintended consequence was that arrests brought onto a property by city police were subsequently used by the city as evidence of nuisance abatement violations against that property owner. Sworn testimony before the house committee described specific cases of misuse of the statute by city officials such as:

- Targeting of a few, select businesses in high-crime areas, while ignoring more serious crimes occurring on surrounding properties;

- Directing businesses to hire certain security personnel with the clear suggestion that hiring these select individuals would diminish the city's threatened enforcement of nuisance abatement;

- Parking a large number of police cars in the parking lot of a business owner as a retaliatory act toward that owner, who had challenged the city's nuisance action against him and had testified in court on behalf of an individual who was acquitted of charges for resisting arrest while on the business' property;

- Using calls to police requesting assistance by the business as marks against that business in the city's criteria for evidence of nuisance abatement violations;

- Directing a hotel property owner to run criminal history checks on all guests, which is a possible violation of the guests' civil rights and could potentially subject the business to legal liability; and

- Sanctioning a local car wash owner because marihuana was found in the pants pocket of a person working on the property. It was suggested by the city legal department that the owner needed to conduct random pat-down searches of persons working on the property on a regular basis -- an act prohibited by law even for law enforcement officers.

The city's methods created a no-win situation for businesses. A business owner who did not call the police for help was branded as one who tolerated nuisances. On the other hand, calls made by a business for police assistance to apprehend individuals engaged in illegal activities were then used as evidence against the business that crime was occurring on their premises.

To clarify the language and prevent further misuse of the statute, the legislature enacted House Bill 1690, which states that a person maintains a common nuisance if the person "knowingly tolerates the activity and furthermore fails to make reasonable attempts to abate the activity". The legislation also specified that evidence that a person "requested law enforcement or emergency assistance with respect to an activity at the place where the common nuisance is allegedly maintained is not admissible for the purpose of showing the defendant tolerated the activity or failed to make reasonable attempts to abate the activity alleged to constitute the nuisance".

It was hoped that passage of House Bill 1690 would clarify the appropriate uses of the nuisance statute and curb the types of abuses that had been documented. In light of the testimony elicited during committee hearings during the 79th Legislative Session, the Speaker of the House of Representatives issued the following joint interim study charge to the House Committee on Criminal Jurisprudence and the House General Investigating and Ethics Committee:

***Monitor the use of nuisance abatement authority by the City of Dallas and investigate unresolved issues pertaining to allegations of possible civil rights violations that may have been committed under color of law by local government.***

# SUMMARY OF PUBLIC HEARING TESTIMONY

### *October 11, 2005*

Richard Clouse

Senior Vice-President of Budget Suites of America. His company has been very cooperative with law enforcement in fighting crime on their property. He relayed a conversation that occurred between the SAFE Team and Budget Suites in an Accord Meeting on November 7, 2005 at which Budget Suites representatives were told that law enforcement was not to be contacted unless it was a life or death situation. As a result they cannot work with the Dallas Police Department (DPD) due to fear that it will be used against them.

Their only recourse is to evict persons from the hotel rather than have them arrested, which compounds the problem. He believes complying with the City's requirements do more harm than good. The police department conducted undercover operations designed to create crime on the property. While the City alleges that six undercover drug buys were made on the property, Budget Suites was not contacted about these incidents until September with information about the drug buys. Five of the six buys were represented with no information to support what occurred on the property; there are no room numbers, names, or dates. Another incident refers to Room 1096, which was the subject of a smoke alarm inspection the day before the arrest and was found to have no criminal activity.

In September 2005, Budget Suites met with **Deputy Chief Julian Bernal** and four city attorneys and they confirmed the placement of undercover officers on the property and confirmed that incidents may be developed off property but brought onto the property

and that Budget Suites would still be responsible for the activity. This is bad faith and deprivation of due process rights and possibly fraud.

He expressed concern for the safety of his employees and clients when officers are bringing crime to the property. Budget Suites has never been involved in a litigation where the opposing party is free to continually take steps to undermine their business. He believes the company has enough evidence to pursue this through the civil process.

At a September meeting with Chief Bernal Mr. Clouse asked the chief what more could be done to prevent further problems. The chief could not think of anything. Mr. Clouse stated his belief that it was the SAFE Team and their supervisors who encourage criminal activity on the property. Mr. Clouse indicated that the situations whereby police officers bring criminal activity back to the property was occurring after HB 1690 was enacted.

Police posing as prostitutes will typically rent a room at the hotel and bring persons attempting to hire them back to the property and the activity is used against the property in the nuisance suit. There are about ten instances where police have brought crime onto the property and have attributed the crime to the business.

**Chief David Kunkle**                    Dallas Police Department Chief of Police. The SAFE Team is a unit within DPD, members of which are selected through an application and interview process. The SAFE Team was created to deal with public nuisances utilizing an integrated unit involving police, code enforcement, fire department, and city attorneys. The SAFE Team cases typically operate with a

detective, code enforcement officer and a fire inspector. During the Accord Meetings, a supervisor is also involved. SAFE cases typically derive from the police department's own data, referrals from various units of the police, or community referrals.

The comments heard from Mr. Clouse are contrary to what he heard from a vice president of Budget Suites with whom he met after the legislative hearings in Austin. In that discussion, the vice president acknowledged having problems with security and bad management and had promised to work cooperatively with the police department. Chief Kunkle recently recommended reducing the SAFE Team unit from fifteen officers, three sergeants and one lieutenant to seven officers and a single sergeant because he believed that since so many people were working the SAFE Team, they could be reaching for cases that may not have been the most appropriate candidates. This recommendation was implemented on October 1, 2005.

The SAFE Team has been operating since 1991 and there are also many success stories involving the SAFE Team. The success of SAFE teams is measured by the reduction of abatable crimes. DPD simply wants Budget Suites to have good and reasonable business practices and he believes that there have been difficulties in communicating this message.

DPD prohibits the SAFE Team from encouraging businesses to hire off-duty officers. With regard to the situation discussed earlier that occurred in 2001, he believes the officer made a joking comment which was not to be taken seriously.

Chief Kunkle indicated that the SAFE Team began in 1991 at the height of the crack epidemic when Dallas had 500 murders that year. Lieutenants of the SAFE Team are picked by chief level officers. No SAFE Team operations occur unless the property at issue has had three abatable crimes within one year.

Most nuisance cases were focused on drug houses, places of prostitution, and sexually oriented businesses. Rep. Hodge expressed her belief that the SAFE teams do not focus adequately on drug houses. She also said that none of the drug houses in her district were effectively targeted by SAFE teams, which were instead focusing on businesses. In response, Chief Kunkle indicated that what the committee is hearing about today is a very small percentage of cases involving the SAFE Team. Not all of the cases involve businesses. In residential properties, owners can just evict problem tenants. Such an action is not applicable to businesses. He said the car wash on MLK is one of the most notorious drug dealing locations in South Dallas.

The act of intimidation that occurred either in 2001 or 2002 that involved a group of officers (eleven police cars total) showing up at the car wash on MLK with the intent to intimidate the owner was inappropriate, embarrassing, and stupid. It was done in response to the car wash owner testifying on behalf of a man cited for resisting arrest. No action was taken internally against the supervisor who carried out the act of intimidation. Chief Kunkle agreed with Rep. Keel that the action could be potentially a civil rights violation or official oppression under state law and he indicated that the FBI has the information but was unaware as to what has been done with it.

Barbara Edmondson

Ex-owner of properties in Dallas. Ms. Edmondson shared with the committee instances in which police did not adequately react to drug activities on or near residential apartment locations. She believes that only when pressured by the Legislature will the police department properly enforce the law. She was informed by a Deputy Chief from the Southeast station of the results of a raid on a drug house: nine arrests were made, drugs and weapons were obtained, and a sex offender and a person carrying a gun were picked up. She wonders why there is police protection in certain areas and not in others. Ms. Edmondson claims that police will not address the Dixon Street and Grovewood areas of Dallas. She has been told by police that officers must tolerate drug dealing by boys because they need to support their families. The nuisance team has never touched or closed down any of the real drug houses on her street that she has reported. She was told by Chief Paulhill that police can only approach suspects based on probable cause of gun activity and not drug activity.

When an area is deteriorated, code enforcement and police don't pay attention because there are federal funds available to refurbish the areas. Apartment tenants are scared of the police and won't call when disturbances arise, so they call the apartment management to call the police for them.

A manager at her firm, who she later found out was dealing drugs, had contact with a Dallas City Council member and a liaison who told the manager that the police were going to raid his area and for him to clean it up.

Officer Ricardo Campbell

Dallas Police Officer. Officer Campbell

patrols the area surrounding the Budget Suites and found the management to be cooperative in assisting to combat crime. He wrote a letter of support on behalf of a manager who was in fear of losing his job due to the activity that occurred on the property.  The letter stated that the management was cooperative in helping the police to reduce crime. As a result, Officer Campbell was referred to Internal Affairs for violating a general order regarding outside correspondence.  He was unaware of who initiated the referral. To his knowledge, there was a recommendation from a chief that the complaint should have been voided. He understands that it was wrong to violate departmental policy in writing the letter of support but would do it again because he believes the community and the police need to work together to combat crime.

John Garner

Part-owner of Super Stop Beverage. Upon its opening, his business was protested by individuals **Councilman Chaney**. Protestors were concerned that there were too many liquor stores in the area.  In 2003 and 2004 he was asked to donate $6,000 in two gifts to Clean South Dallas and he did so. Reps.  Hodge and Keel questioned Mr. Garner as to who requested the donations. Mr. Garner stated that it was Councilman Chaney and that he subsequently spoke with the Councilman's staff regarding the donation.

Dale Davenport

Owner of Jim's Car Wash. He was approached by **Telitha Shaw**, a code enforcement officer, who told him she would have to write him a ticket based on instructions from her supervisors. He claims that he and another business owner were told by Councilman Chaney that "some business owners must die so others can thrive" regarding a moratorium on

businesses considered to be non-conforming uses and required to obtain special-use permits to continue in operation. He was told by **Andy Seagal**, an attorney with the South Dallas Business Association, that the Councilman was not pleased with his commitments to the community and that he needed to make a donation to the African American Book Fair. Mr. Davenport donated $500. In January 2005, Mr. Davenport spoke to Councilman Chaney about the injunction on his business and Cheney suggested that Davenport hire the Nation of Islam or JL Security. Sixty percent of his revenue is spent on guard service required by the SAFE Team. As part of the injunction placed against his business, he must comply with all provisions of the judge's order for one year.

Dwaine Caraway | Questioned the selective enforcement targeted at Mr. Davenport's car wash instead of the drug houses around the car wash which he sees as more of a problem.

Robert Rowe | Mr. Rowe works as a night manager for a real estate company that owns three large apartment complexes in Dallas.  He is also a retired Dallas police officer. When he calls the police because of a disturbance on the property, he says they first tell him what they cannot do. Then they proceed to tell him that they will help the property if he hires them off-duty. He would like an Attorney General's opinion to determine if it is legal to rent out police cars along with officers. He relayed a story in which he told police officers of a man who was beaten and robbed and asked them to call the ambulance. They told him they couldn't respond even though they were in uniform and in a police car because they were on their way to work off-duty security jobs.

Chief David Kunkle

The department began a program in the early 1990s whereby neighborhood associations can hire officers off-duty along with old patrol cars that were to be put out of service in order to patrol their residential neighborhoods. He indicated that if he had been chief at the time, he probably would not have wanted to implement the program. Rep. Dutton questioned the legality of the program because it utilizes public property for a private benefit. Chief Kunkle responded that, in theory, the association is paying the costs of the officer and the patrol car along with the equipment in the car. Rep. Dutton also stated that the program may have constitutional problems due to possible equal protection violations.

Rep. Keel also expressed concern that the basic service taxpayers should receive from the police force has been moved to a user-fee basis. Rep. Dutton said that while Dallas needs more police, the off-duty jobs in the current form provide law enforcement services only for those who can afford to pay extra for those services. He also suggested having constables perform these off-duty neighborhood jobs since their primary duty is not that of a police function.

Chief Kunkle stated that the complaint against Officer Campbell was received by the police department and investigated. The department found that no misconduct occurred and he rescinded the complaint. In response to a question from Rep. Keel, he indicated that the complaint originated from the City Attorney's office. Rep. Keel said that the conduct by the City Attorney's office was official oppression in that it was attempting to intimidate an honest officer who wrote a letter on behalf of a business that is in an adverse situation with the City.

Calvin Johnson

Attorney for Dale Davenport. Mr. Johnson relayed a situation where two undercover police officers were sent to view situations occurring at Mr. Davenport's car wash. Mr. Davenport called the police over 100 times for assistance, but was response by DPD was often too late.  He asked the officers during cross examination if they made any arrests while undercover at the car wash. They indicated they did not because they didn't want to compromise their undercover status. Mr. Davenport does everything he can to fight crime on the property while problem businesses in the neighborhood go unnoticed by the City. He expressed concern for the financial difficulties Mr. Davenport has undergone with regard to the City's stance against him.

Se-Gwen Tyler

Represents Arlington Park Neighborhood Association Crime Watch. She is very surprised to hear that police officers were paid to patrol certain areas, which her neighborhood cannot afford. She does not want to see the nuisance law weakened or abused. In her neighborhood there are several drug houses that have been busted four times during the past year. She is concerned that the drug dealers are being tipped off to the police raids because the dealers act in the open but when the raids occur they are nowhere to be found. She believes that drug dealing and prostitution does occur in Budget Suites.

**_October 12, 2005_**

Tom Perkins

City of Dallas City Attorney. Mr. Perkins testified that the City listened to concerns expressed by the Legislature and initiated a review of its SAFE Team practices and procedures. The City Manager authorized the formation of a Task Force comprised of members of the business community,

community groups, city offices, etc. to improve the SAFE Team process. The Task Force made several recommendations designed to foster a more cooperative approach in dealing with SAFE Team enforcement. The goal is to reserve litigation and aggressive procedures for those situations where all other efforts have failed.

Almost 2,000 SAFE Team investigations were opened over a four-year period and only 60 lawsuits were filed for an average of 15 each year. He feels the City Attorney's office use of the nuisance suits has been judicious. He was asked to respond to documents signed by Dallas citizens stating that on April 7, 2005 they were denied the right to testify before the House Committee on Civil Practices. These signed witness statements were prepared and provided to citizens by the City. Mr. Perkins said that although his office typed the statements for the South Dallas citizens, it was their own account of what occurred. He admitted that the City legal office used taxpayer dollars for the preparation and distribution of the statements.

Mr. Perkins was asked to identify all individuals who participated in the decision to lodge an internal affairs complaint against **Officer Ricardo Campbell**. He testified that **Asst. City Attorney Nicole Hobeiche** made the initial complaint verbally through a phone call to the police department. This complaint resulted in an investigation. The complaint stemmed from discovery responses during litigation with Budget Suites that revealed the property was providing local law enforcement officers residence in exchange for their agreement to patrol the property. He asked the committee to review the last page of their handout from the City, a grid of the

Budget property. Officer Campbell is shown as residing in one of the rooms. Mr. Perkins was asked to produce all notes, telephone memoranda, and background information documenting what was used to formulate the complaint. Mr. Perkins was unable to provide the information to the committee at that moment, but agreed to a request by Rep. Keel to provide the information to the committee at a later time.

He was asked who was contacted or interviewed as a result of the investigation. Mr. Perkins responded that his office simply turned over the information to DPD and had no other role in the investigation. He said Ms. Hobeiche spoke with the Internal Affairs Department investigator once. He was then asked to identify all the individuals who participated in the disciplinary process that was initiated and concluded against the officer. Mr. Perkins responded that he could not identify those individuals and would need to request the information from DPD. He was also asked to identify all City Attorneys who participated in the initiation of the complaint and with the investigation against Officer Campbell. Mr. Perkins was unable to identify the individuals at that moment, but agreed to provide the committee with the names before the end of the hearing.

Mr. Perkins was asked if the Task Force included individuals from the hotel/motel association or car wash association. He responded that it did not. Of all the lawsuits filed, there has only been one dealing with a car wash. He said he did not feel that certain groups were excluded, though he admitted that he did not invite anyone from the two associations mentioned. Mr. Perkins outlined the City's new operating

procedures. Rather than beginning an investigation with full SAFE Team involvement, Interactive Community Policing (ICP) officers and patrol officers will make an informal contact with the business. Instead of sending SAFE Team officers, local beat officers who are most familiar with the site will respond and begin the process of negotiating and discussing the best solutions. At that point, if they are unable to resolve the problem, a recommendation will be made to open a SAFE Team investigation.

This investigation requires documentation from the SAFE Team and recommendations from someone higher up in the chain of command. If after this review the decision is made to open up an investigation, that process will then begin. The SAFE Team will again attempt to cooperate with the business and reach a consensus. If there is still a problem with the property, there will be another round of recommendations and written documentation followed by a decision made by the First Assistant Chief of Police who will ultimately decide whether or not the case should be referred to the City Attorney's office for litigation. Mr. Perkins said this process will be a fair and good one for all stakeholders. This plan will also apply to residential communities.

He was asked what kind of funding is used for SAFE teams. He responded that General Fund monies from the Police Department are used, in addition to some Community Block Development Grant funds.

Mr. Perkins was asked about the document showing Officer Campbell's room at Budget Suites. He said his office simply turned the information over to chain of

command. He was then asked how many internal affairs complaints were filed on other officers living at that residence. The only complaint filed was against Officer Campbell. Rep. Keel stated that the only officer who had an IA complaint filed against him at City Legal was the one officer who befriended a business in an adverse legal position with the City Attorney's office. Mr. Perkins maintained that his office did not know the relationship between Officer Campbell and Budget Suites.

Steven Stefani

Corporate Counsel for Budget Suites of America. Mr. Stefani responded to an inquiry as to how many DPD officers were given residence at the aforementioned Budget location. He responded that three officers were provided residence and are shown on the diagram the City provided to the committee.

Tom Perkins

Mr. Perkins admitted that Officer Campbell was the only officer his office contacted DPD about but they did not file a complaint, they simply notified chain of command about what had occurred. The chain of command made whatever decisions they found appropriate at that point. He stated that his office did not actually contact Internal Affairs to file a complaint; they contacted **Lieutenant Hearn**, head of the SAFE Team. Mr. Perkins agreed that the only distinction between Officer Campbell and the other officers residing at Budget Suites was that he wrote an honest letter on behalf of the hotel and the City Attorney's office was in adverse litigation with that property. He could not explain why the names of the other officers were not handed over to DPD. He stated that his office did not know what any of the officers were doing there or whether it was legal or illegal. They alerted

the police department to the one situation involving Officer Campbell and turned it over to them.

The text of Officer Campbell's letter on behalf of Budget Suites was read to the committee. Mr. Perkins was asked if anything in the letter was untrue. He replied that he did not know that any of it was false.

Ron Waldrop

Assistant Chief of the Dallas Police Department, currently assigned as Bureau Commander over all investigations in the department. At the time of the incident being discussed, he was the Patrol West Bureau Commander and Officer Campbell worked for him. Mr. Waldrop was in the chain of command and reviewed the investigation. He recommended the department void the complaint and it was subsequently voided. The investigation of the complaint did not establish an employment relationship between Officer Campbell and Budget Suites.  Had such a relationship been in existence, it would have been governed by departmental rules. The only thing the complaint sustained was that a letter was sent without going through the proper chain of command. He recommended to void the complaint because such incidents are not uncommon and the normal process for addressing such a violation is to have a supervisor talk with the officer. Mr. Waldrop stated that he did not think the issue rose to the level of an IAD complaint and recommended the complaint be voided. Chief Kunkle agreed and the entire investigation was rescinded.

He was asked by the committee how the IAD complaint occurred. He confirmed that it stemmed from a verbal notification of Lieutenant Hearn. Technically, Lt. Hearn requested the Internal Affairs investigation

from an internal source. He agreed that the City Attorney's complaint is what technically generated the IAD complaint.

He added that the map did show other officers residing at the Budget Suites and included their names. Another officer was interviewed on the matter of residency. The map shows an FBI room, a general police room, a room for **Robert Garcia**, and a room for Officer Campbell. Regardless of the content of the letter and whether it was favorable or unfavorable to Budget Suites, officers are not supposed to write such letters without going through the proper chain of command.

In response to questions about the procedure for police officers working off-duty, those officers must notify the department of who is employing them, specifically what they are doing, and the conditions of employment. There are rules about what an officer can and cannot do in extra jobs. DPD manages and tracks the off-duty employment of officers.

| Marshall Cornelius | Self-employed at Jim's Car Wash. Mr. Cornelius filed a complaint with Internal Affairs after **Officer Willie Demetrius Byrd** harassed, assaulted, and falsely arrested him. Officer Byrd told Cornelius that he could not wash cars at the car wash and proceeded to follow him to his home. Officer Byrd asked him to put his hands on the car, at which point he handcuffed him. He kicked Cornelius in the jaw three times and hit him in the back of the head. He was taken to detox where he stayed for two hours before Officer Byrd transferred him to Lou Sterrit jail where he was booked and spent 21 days for criminal mischief. After his release, Officer Byrd sought him out again and asked him if he "had a good vacation." He has not seen Officer Byrd |

since that visit. He provided the committee with the statements he gave to Internal Affairs in 2001. He has never heard from them.

Mr. Cornelius believes this harassment resulted from an incident when an individual escaped from Officer Byrd. Immediately after that event, Officer Byrd told the carwash staff that he would harass them until they told him where he could find the individual who ran from him. No one provided him with this information and the harassment continued on a daily basis with Officer Byrd forcing Mr. Cornelius and other individuals to leave the property because they were "pandering." Officer Byrd does not engage in this conduct with other car washes and he has told Mr. Cornelius and others that they may go down the street and wash cars at other businesses.

Mr. Cornelius also described a scene at the car wash where police officers arrested an individual on October 4, 2005 while wearing makeup and filming the incident.

**Bobby Murphy**

Mr. Murphy testified in court on behalf of **Kevin Black** in a dispute about whether it was Officer Byrd who assaulted him or Mr. Black who assaulted Officer Byrd. Kevin Black was acquitted and Mr. Murphy testified as a witness to the incident. The day after his testimony, Officer Byrd told him he would take him to jail every time he saw him. Mr. Murphy did not file a complaint with Internal Affairs.

**Thomas Scott**

Owner of The Wash Rack car wash. He has experienced  numerous difficulties with homeless individuals, drug dealers, and prostitutes on his property. After learning of the situation with DPD and other car washes, he is now afraid to call DPD for

help with problems on his property for fear of losing his business. Mr. Scott purchased a Taser gun and pepper spray for protection. On two occasions DPD officers told him that hiring off-duty officers would help to eliminate the problems on his property. He also had an officer tell him that every time he calls DPD, it is recorded on the computer and counted against him. Another officer told him that Dale Davenport was in cahoots with the drug dealers and other criminal elements.

Mr. Scott has also asked for help with neighboring properties, but has never seen any results. He spoke with a SAFE Team officer about prostitutes living in cardboard boxes on the creek behind his car wash. They did not arrest the prostitutes, but did ask them to leave. Homeless people inhabit an abandoned building next door to his and after numerous calls, he was promised the property would be turned over to the City Attorney's office. No action has been taken. He testified that police are aware of drug dealing and crack houses that operate year after year with no consequences while honest businesspeople are harassed.

He approached officers within one block of his car wash and asked for help with homeless people on his property. The officers told him they could not assist him and instructed him to call 911. Mr. Scott estimated that when calling 911 it typically takes an hour and a half before anyone appears. He did have an officer take immediate action on one occasion but Mr. Scott cautioned that such behavior is not the norm.

James Mosser

Mr. Mosser is a lawyer who would like Chapter 125 repealed because it is used by the City to abuse property owners. Even when people fully comply, the City does

not care and continues to harass individuals. Furthermore, the City does not respond to emergency calls. During trials he has questioned DPD officers who admit that they don't arrest prostitutes and drug users because they can't keep them in jail long enough or are waiting to catch larger dealers. Furthermore, he feels that the evidentiary standard should be changed to "clear and convincing."

Willie Mae Coleman

Ms. Coleman is a resident of South Dallas who signed one of the statements prepared by the City Attorney's office. She stated that she prepared it along with the City. She had to leave the hearing that occurred in April at 9pm and could not testify.

She has reported approximately ten crack houses to the city and all but one has been eliminated. The remaining crack house is located on York Street.

William Vandivort

Mr. Vandivort is a Lake Highlands resident who described the efforts of his neighborhood association. He would like more nuisance suits filed by the City and the law strengthened.

Cheryl Pucci

Ms. Pucci represents the Apartment Association of Greater Dallas. She expressed her gratitude for HB 1690, which has greatly improved the SAFE Team process. She testified that apartment communities are lacking the same services and experiencing the same problems as businesses. In 2003, the apartment industry spent $40 million in security costs because they could not acquire police protection. Half of that cost was spent on hiring off-duty police officers. The $40 million figure does not include costs for lights, gating, intrusion alarms, etc.

Ms. Pucci described a 540-unit property at

Preston and Beltline, where she learned
there were 4 abatable crimes in one year.
These crimes did not appear on any police
reports, crime statistics, or information
given at monthly meetings. The SAFE
Team visited the property with five police
officers and a fire inspector, who went door
to door testing smoke alarms.

She stated that she did not attend the
property's Accord meeting with the City
because she refused to be videotaped.
Her refusal was based on information she
received from a SAFE Team Sergeant who
explained that participants are videotaped
so the footage can be used against them in
court proceedings.

During these meetings participants were
also required to give the city their driver
license. When the president of Ms. Pucci's
company attended the Accord meeting, he
received two citations for failing to attend a
previous meeting, even though he sent
representatives on his behalf. The citations
were dismissed once an attorney was hired.

**Steven Stefani**

When these procedures were brought to the
Police Chief's attention, they were
changed.

Corporate Counsel for Budget Suites of
America. Mr. Stefani described difficulties
Budget Suites is experiencing with the
City. His company requested to be advised
of all undercover activities on their
property so they could assist the police
department. They have been told that they
cannot be given such information, despite
the fact that no other law enforcement
agency in the nation has ever refused this
request. The hotels are always apprised of
undercover activities so they can protect
their people and the operation.

In August 2005, they were made aware of undercover activities that had taken place throughout the month. Mr. Stefani said the timing of those activities is suspect, as it is two months after the legislation was passed and five months after the Rule 11 agreement was entered into between the Budget Suites and City of Dallas. Under this agreement, both parties agreed to suspend active prosecution of the hotel's defense and active prosecution of their case to allow Budget's system time to work. If they were working, the City would dismiss. In that five month period, there was not one abatable offense that occurred at the Budget Suites on Stemmons Freeway until the undercover activities. If not for the undercover activities of DPD directly calculated at their property and facilitated by individuals experienced and charged with the duty to create crime on that property, there would be no abatable crime reported for the month of August.

Budget Suites investigated the content of the letter they received on September 7, 2005 from the City Attorney's office. There were a total of 8 potentially abatable offenses, mainly drug buys, but also one of which was an assault with a weapon. The assault did not show up on surveillance tapes and Budget Suites has no way to confirm it. The undercover drug buys are not identified with any specificity- no individual is named, no time and date, and no description that helps Budget Suites abate the crime.

Mr. Stefani said Budget Suites requested an agreement in September during a meeting with **Deputy Chief Bernal, Assistant City Attorney Jennifer Richie, City Attorney Tom Perkins,** and **Officer Thompson.** Two undercover drug buys were listed in

the September 7th letter that an investigation by Budget Suites revealed to be off-property incidents that had been brought on property or assigned to the property. As a result, Mr. Stefani requested an agreement from the City Attorney's office and DPD that any abatable incident developed off-property but brought onto the property solely by undercover officers living on Budget Suites property, and where there was no other relationship between the other actors in that criminal transaction to the property, would not be held against Budget Suites as abatable offenses. The City refused to make that agreement.

He testified that Ms. Richie claims the scenario involved prostitution and that is not the case. When prostitutes are found living on the property and bringing clients onto the property, Budget Suites is committed to stopping such activity. The point of the agreement was that Budget Suites should not be held accountable for undercover crime stings that occur off of its property. Since that meeting, Budget Suites has evicted two individuals they later learned were undercover officers who were involved in various undercover activities. He stated that it is his understanding that the police department is extremely upset that these officers were evicted.

Mr. Stefani stated that the City Attorney's office will literally resort to tactics that compromise their ethics, the integrity of pending litigation, and the law. The City Attorney's office has sought to manipulate the course of discovery in their litigation by tampering with a witness and by seeking to quiet any other witnesses that may provide positive testimony for Budget Suites' defense.

The complaint against Officer Campbell was frivolous and the City Attorney directly involved in litigation has no business lodging an unethical complaint. Two other DPD officers received free housing and one Budget Suites room is identified as a General Apartment because there were several different officers using it. No complaints were lodged against them.

He feels the committee should thoroughly investigate further the prosecution of each common nuisance lawsuit brought by the City of Dallas.

**James Bearden** told Mr. Stefani that if they hired a Lieutenant or Sergeant from DPD, their "problems would go away." Mr. Bearden has administrated the examinations for the Texas Commission on Private Security for 20 years. Mr. Stefani stated the he would provide the committee with additional information on Mr. Bearden.

Mr. Stefani showed photographs of the Stemmons Freeway property. He gave the committee a videotape of a Channel 11 story from April 2005 where the Mayor boasts about the success of the common nuisance legislation and a Lieutenant talks about hiring off-duty officers.

He also discussed the InTown Suites directly adjacent to Budget Suites. Budget Suites' security efforts have identified that prostitutes and drug dealers live on the InTown property. A confidential informant that the City used in an undercover operation was living at the InTown suites and coming over to Budget Suites. There has been no action against the InTown Suites. Budget Suites offered the property a list of individuals no longer eligible to stay

at Budget Suites' properties and InTown declined the information. Budget Suites Regional Manager **Dana Alexander** stayed at the InTown Suites and left shortly after midnight because she felt unsafe due to the presence of prostitutes and drug dealers.

Budget Suites has chosen not to hire off-duty police officers. Instead, they hire security personnel who all have a minimum of five years actual law enforcement experience. Most of their security personnel are former military police with investigative backgrounds.

Dale Davenport

Owns Jim's Car Wash on 2702 MLK Blvd. He and his father bought the property in 1993 and invested $250,000  in the car wash after the purchase. He read a quote published in the Dallas Morning News on September 5, 2005, from **Senior Corporal Sheldon Smith,** who discusses his need for off-duty employment. Mr. Smith participated in Mr. Davenport's Accord meeting in 2001. Mr. Davenport said he feels this is a conflict of interest.

In 2001, the SAFE Team told him there were drugs on the property. When his father suggested a sting operation and that they work with the police, the police laughed. In 2003, the City filed a temporary restraining order against their business. The Davenports attended an Accord meeting during which they were told that they needed to do additional things to improve the safety of their property. While Mr. Davenport said they would install cameras,  the City Attorney's office wanted them to hire a guard service instead. Two weeks after hiring guards, **Charlie Kim** said the City was not happy with the guard service and they needed to do a better job patrolling the property. This complaint occurred when they already had two armed

guards patrolling a property that is less than 25,000 square feet. He and his guard service have worked tirelessly to comply with the City. However, they asked him to fund 72 hours a week of security. The cost of this was prohibitive and demonstrates how businesses cannot survive with the City's current attitude. The permanent injunction is on their property until November 19th, 2005.

Mr. Davenport stated that he has called the police department over 100 times. The more he called the police, the more he was considered a public nuisance by the City.

He showed an incident report where his home was shot at on March 28, 2002, after testifying in the Kevin Black case. He went to Internal Affairs, but it was never investigated. He recently learned that case is just now being examined.

Ms. Richie stated on Channel 11 that there was a murder at his car wash. She referenced this during the trial, as well. Witnesses who saw the incident said it occurred 300-400 feet away from his property. Mr. Davenport stated that the City of Dallas will do anything to build a case against business owners.

He reviewed tapes of an arrest that happened on the car wash property involving officers in makeup holding camcorders. After investigating, he learned that it was for the filming of the television program Cops. Mr. Davenport did not give anyone permission to film a fake drug bust on their property and wondered how they were able to use DPD vehicles.

Tom Perkins

Mr. Perkins responded to questions about the Cops incident. He stated the he knows nothing about it, but would try to provide

the committee with information.

# COMMITTEE RECOMMENDATIONS

In fulfilling the charge to monitor the use of the nuisance abatement authority by the City of Dallas, the House Committee on Criminal Jurisprudence and the House General Investigating and Ethics Committee held a joint public hearing in Dallas and heard many hours of public testimony. The committees also received and reviewed numerous documents provided by city officials and concerned citizens. A review of the testimony and documents reveals that the concerns expressed by citizens and legislators during the regular session have not been resolved and the interim study has raised new concerns.

## TESTIMONY AND EVIDENCE

Multiple witnesses testified before the committees and repeated the allegations made during the regular session concerning the City of Dallas: that the city has in many instances targeted honest businesses in a selective application of the nuisance statute; that the number of abatable offenses used against a property included activities instigated by the police themselves (i.e., undercover operations where criminals are solicited by police to come on the property or traffic stops that happen to occur in the same block as the business); and that property owners were directed to hire off-duty Dallas Police Department officers with the implication that doing so would help end their legal conflict with the city. The most troubling aspect for the committees was testimony about the continuation of these practices even after the effective date of H.B. 1690, which included legislative changes designed to curtail these types of abuses.

The committees also heard testimony about new allegations that were equally disturbing. Chief among these addressed possible inappropriate attempts at witness retaliation involving the Budget Suites property located at 8150 North Stemmons Freeway, which at the time was being sued by the City of Dallas under the nuisance statute.

The incident concerned a letter of support written on behalf of the hotel by a Dallas patrol officer. The manager of the Budget Suites was justifiably concerned that crime statistics in and around the hotel, including crime brought onto the property by undercover Dallas police operations, traffic stops on the parking lot or public street adjacent to the property, or calls for assistance from the hotel itself, were being used by the City of Dallas as evidence that the business failed to abate crime. The manager approached several Dallas police officers to solicit a general letter of support for the hotel's efforts to combat criminal activity on the property. One officer, Ricardo Campbell, agreed to the request. On October 27, 2004, Officer Campbell provided the manager with a handwritten letter in which he stated in part:

*"I would like to commend the manager of the Budget Suites Hotel for their pro active approach in fighting crime at their establishment. Dallas police officers have made numerous arrests do (sic) to surveillance rooms that were provided through the Budget Suites Hotel. Management is very pro active in assisting officers by providing information and calling the police when they have a problem."*

The letter is dated only five days after the Dallas City Attorney's Office officially filed a nuisance suit against Budget Suites. It is undisputed that Officer Campbell was unaware of the lawsuit when he wrote the letter to simply acknowledge the cooperation he had experienced first-hand as an officer working that patrol area.

On October 28, 2004, Officer Campbell's letter was provided to the City Attorney's Office by an attorney for Budget Suites during a meeting to discuss the lawsuit. On that same day, the assistant city attorney assigned to the case contacted the head of the SAFE (Support Abatement Forfeiture and Enforcement) team responsible for conducting investigations against nuisance properties and objected to the letter, saying it could adversely affect the city's position in the lawsuit. This complaint initiated an internal affairs investigation against Officer Campbell.

The internal affairs investigation was ultimately jettisoned by the police department administration on its own initiative. However, Officer Campbell received a verbal reprimand regarding the writing of the letter.

The subject matter of this testimony --- an obvious attempt to intimidate a potential witness who simply wrote favorable comments about a business --- raised much concern for the committees. It is apparent that the internal affairs investigation was initiated through the influence of the City Attorney's Office, which was in an adverse legal position with the business in question. Members of the City Attorney's Office took exception to a Dallas police officer saying something favorable --- and by all accounts truthful --- about that business, and attempted to punish him. The committees expressed their apprehension that such an act of attempted intimidation might constitute official oppression by city officials and, at the very least, supported charges that the city acts in a heavy-handed and retaliatory manner when enforcing its nuisance ordinance.

Enforcement of nuisance laws is not and cannot be based solely on an owner's awareness of the occurrence of crime on their property. In fact, because Dallas has one of the highest crime rates in the nation, business owners often find themselves victimized by crime. Business owners should only be held responsible for criminal activities that occur on their premises if there is some evidence that the owner failed to take reasonable steps to stop crime or is tolerating the illegal activity. The incident involving the letter from Officer Campbell sustains allegations made by citizens that the City of Dallas often ignores the good faith efforts of property owners to fight criminal activity and instead misuses the nuisance abatement law to punitively target certain businesses.

Similarly, the committees found the testimony concerning the practices used by the city in its "accord meetings" equally troubling. These meetings are held as a means of informal arbitration to supposedly facilitate a discussion about suggested strategies for property owners to prevent criminal activity by others on their property. If the property owner fails to make reasonable attempts to stop the activity, the SAFE team then refers the case to the City Attorney's Office for the possible filing of a nuisance suit.

Citizens testified that the accord meetings resemble more of an interrogation of an arrestee rather than an exchange of information. The city uses intimidation tactics such as requiring property owners or their representatives to surrender their driver's license before being admitted to the meeting as well as obtaining consent to be videotaped, ostensibly for use in court if an agreement can not be reached. Anyone who refused consent was barred from the meeting by the city with the threat that the city would use their "failure to attend" the meeting as further evidence of their unwillingness to combat crime on their property. This testimony again supports the contention that there is an unfair and misdirected culture among the city's nuisance abatement personnel toward property owners who may themselves be victims of crime and who attend these meetings in a good faith attempt to cooperate with the city to combat criminal activity on their property.

The committees also heard from citizens who expressed concern about the inadequacy of law enforcement resources to help fight crime on their properties and in their communities. The committees were told by representatives of properties under a nuisance investigation and by ordinary citizens that police officers routinely suggested that the only effective solution to potential adverse nuisance abatement litigation from the city was hiring off-duty Dallas police officers. The implication was clear – that only through the supplemental hiring of off-duty officers could basic police service be expected to take place and citizens could not expect the city police department to effectively address crime in their area.

In essence, the citizens of Dallas, who have paid their taxes for law enforcement services from the police department, were in some cases being told that even basic calls for service would be ignored. Some witnesses alleged they were told by the police department *not to call about anything unless it was a life and death situation.* It bears repeating that such calls were also being used as a threat to be counted against the caller, who would then potentially find themselves as a defendant in a possible nuisance abatement action from the City Attorney's Office.

The committees heard evidence, which had also been heard by the House Committee on Civil Practices during the 79th Regular Session, alleging that certain elected officials were involved in directing property owners to hire certain security personnel or make contributions to particular causes in order to mitigate the city's pursuit of the business through the nuisance abatement statute.

Underlying the repeated allegations heard by the committees is a recurrent theme of ward-based politics run amok as the selective enforcement of nuisance laws protect politically-connected insiders and punish their competitors. The committees heard allegations of undue political influence being used to benefit businesses and property owners who responded favorably to "suggestions" that they channel funds into an incumbent official's favored non-profit organization or that they hire security personnel from a company owned by another local elected official with powerful political ties. Those who refuse to play by such rules, the committees heard repeatedly, found themselves the target of random police

searches, fire and other code inspections and costly, time-consuming litigation. Worse yet were allegations of deliberate acts of intimidation by uniformed police including at least one reported instance of assault and false arrest and another account, verified by city officials, of nearly a dozen marked patrol cars converging on the premises of a business in apparent retaliation following the owner's testimony in court on behalf of an individual charged with resisting arrest and who was subsequently acquitted of all charges.

As a result, the committees are gravely concerned that the problems stemming from Dallas' use of the nuisance laws are the result of a unique and incorrect interpretation of those laws by city officials -- wrongly taking the laws to mean that fighting crime is no longer the city's responsibility but has instead now become primarily the responsibility of private citizens and businesses; and that private citizens can be held strictly liable for crimes that take place on or near their property even when they are not involved in that crime, have taken affirmative steps to prevent the crime,  are themselves victims of that crime, and have reported the crime, requesting the assistance of law enforcement agencies.  Furthermore, the body of evidence available to the committees also strongly suggests that the city uses the nuisance laws to intimidate, promote cronyism, and inappropriately use law enforcement personnel, specifically uniformed police and code enforcement officers, to deliver not-too-subtle messages of coercion and retaliation to legitimate businesses and property owners who refuse to submit to such tactics.

It should be noted that during his relatively short tenure, the current Dallas Chief of Police, David Kunkle, has attempted to change some of the troubling ways the city exercises its enforcement of the nuisance laws.  On October 1, 2005, at Chief Kunkle's recommendation, the size of the SAFE team was reduced from fifteen officers, three sergeants and one lieutenant to seven officers and a single sergeant out of concern that having so many people working on the SAFE team could result in filing inappropriate cases. Procedures for the accord meetings were modified in response to legitimate complaints about the hostile and adversarial approach taken by the city.  The attention given to these issues by Chief Kunkle is admirable and the committees believe most employees and officials of the City of Dallas are dedicated to serving the public with honor and integrity.  However, the abuses recounted in extensive testimony indicate enough grave irregularities in the city's conduct that the committees remain skeptical that the city, and the City Attorney's Office in particular, will appropriately exercise discretion in the pursuit of nuisance lawsuits in the absence of further legislative action.

## SUMMARY

The committees received live testimony and other documentary evidence that shows a continuing pattern of abuse in the utilization of Chapter 125, Civil Practice & Remedies Code, by the City of Dallas.  Over the past few years, the legislature has responded to the legitimate need of municipalities for stronger nuisance laws to help rid their communities of scourges such as crack houses, locations for proliferation of prostitution, and the plague of abandoned inner-city properties.  Cities such as Dallas have faced very real difficulties in dealing with absentee landlords or owners who conveniently turn a blind eye to the illicit

drug trade or prostitution taking place on their properties. However, evidence presented to the committees strongly suggests that the broadened police powers the legislature intended for cities to use with thoughtful discretion have instead been misused by the City of Dallas to target legitimate businesses while ignoring crime on adjacent properties. Routine traffic stops, where drivers are pulled off of public roads onto specific private properties, are often used by the city as evidence against the unwitting property owner instead of the alleged perpetrator. In addition, undercover agents have invited illegal activities such as potential drug deals and prostitution onto specific private properties so that the city could then use those arrests against the unsuspecting property owner. Calls to police by property owners who observe criminal activity taking place on their property have in many instances not resulted in the arrest of the perpetrator, but instead have been used as evidence against the property owner for failure to stop the crime. Private property owners have in some cases been scolded for calling the police and told by city officials that the solution is to hire off-duty Dallas police officers. Money has been solicited by politicians from businesses involved in conflicts with the city over enforcement of the nuisance laws, with the clear implication that such contributions would mitigate that business' problems with the city. Personnel with the City Attorney's Office have engaged in attempts to intimidate one police witness solely because the officer's honesty could potentially harm the city's legal position in a civil lawsuit against a business.

## LEGISLATIVE RECOMMENDATIONS

The House Committee on Criminal Jurisprudence and the House General Investigating and Ethics Committee submit the following recommendations for consideration by the 80th Legislature:

- legislation should be considered regarding the propriety of a city using criminal activity that was brought onto a property by law enforcement when that city takes action against that property under Chapter 125, Civil Practice & Remedies Code;

- the legislature should consider addressing the appropriateness and legality of municipalities utilizing Chapter 125 to selectively target a particular business while crime proliferates on adjacent properties and is ignored;

- the legislature should consider whether it is an appropriate use of government personnel and equipment for cities to sell police protection for a separate user fee where the city has purposefully discouraged citizens and businesses from calling for help from the police in ordinary circumstances;

- the legislature should continue to monitor the use of the nuisance abatement authority by the City of Dallas to ensure that the provisions of House Bill 1690 are faithfully implemented; and

- the legislature should consider enacting a procedure for specific sanctions that can be sought by the Texas Attorney General and levied against an offending municipality if abuses in the utilization of Chapter 125 are proven.

## ADDITIONAL ORDER

The House Committee on Criminal Jurisprudence and the House General Investigating and Ethics Committee direct the committee clerks to forward a copy of this report and relevant documents to the State Bar of Texas for a determination of any violation of rules of professional responsibility pertaining to the role of the Dallas City Attorney's Office in initiating an internal affairs investigation against Officer Ricardo Campbell and the committees furthermore direct the State Bar of Texas to report its progress and findings to the House General Investigating and Ethics Committee.

12/13/17

ORDINANCE NO. <u>30714</u>

An ordinance amending Chapter 27, "Minimum Property Standards," of the Dallas City Code, by amending Article VIII; adding Sections 27-45, 27-46, 27-47, 27-48, 27-49, 27-50, 27-51, 27-52, 27-53, and 27-54; providing a purpose for the habitual criminal property program; providing definitions; providing for the authority of the chief of police; providing presumptions for when a property is deemed a habitual criminal property and when the owner is deemed to have knowingly tolerated the abatable criminal activity; requiring attendance at an accord meeting when the chief determines the presumptions are satisfied; setting out the rules for an accord meeting; creating an offense for failure to attend the accord meeting; providing for an appeal of the chief's determination to the permit and license appeal board; authorizing the chief to require placarding at habitual criminal properties; creating an offense for unauthorized removal of a placard; providing for inspections of habitual criminal properties; providing fees for habitual criminal properties; providing for the delivery of notices; providing a penalty not to exceed $500; providing a saving clause; providing a severability clause; and providing an effective date.

WHEREAS, there are properties where certain criminal activity is prevalent, and it is in the interest of public health, safety, and welfare of the people of the city of Dallas for the city to regulate those properties to reduce criminal activity;

WHEREAS, properties that are the site of five or more abatable criminal activities and with a history of crime are likely to experience an upward trend in crime if the property owner does not take certain steps to improve the conditions and operations at the property;

WHEREAS, signage, like placards, that indicates a property is the site of habitual criminal activity, will provide the city with an essential tool for the effective delivery of public safety services to the city's residents and visitors;

WHEREAS, to reduce and eliminate certain criminal activity, the city needs the cooperation of owners who own properties where persons habitually engage in certain criminal

activity by having those owners take affirmative steps to improve conditions and operations at their properties;

WHEREAS, crime prevention through environmental design ("CPTED") is a proven multi-disciplinary approach to reducing criminal activity, and one that property owners can adopt to reduce criminal activity at their properties;

WHEREAS, regulating habitual criminal properties requires an increased use of city resources, which the city seeks to recover through fees assessed against owners of the habitual criminal properties; and

WHEREAS, pursuant to the city's police powers, home-rule authority, and as authorized by state law, the following regulations are hereby passed; NOW, THEREFORE,

BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF DALLAS:

SECTION 1. That Article VIII, "Reserved," of Chapter 27, "Minimum Property Standards," of the Dallas City Code is amended to read as follows:

## "ARTICLE VIII.

## HABITUAL CRIMINAL PROPERTIES [RESERVED].

**SEC[S]. 27-45 [THRU 27-58].          PURPOSE.**

(a)      Consistent with the findings of fact in Section 27-1 of this chapter, the purpose of this article is to protect the health, safety, and welfare of the people of the city of Dallas by obtaining an owner's compliance with minimum property conditions and lawful operations, which compliance is likely to reduce certain criminal activity on property where that criminal activity is so prevalent as to render the property a habitual criminal property.  Reducing the crime rate in the city of Dallas is essential to making properties safe, sanitary, and fit for human habitation and for nonresidential purposes.

(b)      This article does not create a private cause of action or expand existing tort liability against a property owner.  This article is not a prerequisite to any suit and does not in any way impair the city's ability to file a lawsuit under Chapter 125 of the Texas Civil Practice and Remedies Code, as amended, or under any other law.

## SEC. 27-46.            DEFINITIONS.

In this article:

(1)    ABATABLE CRIMINAL ACTIVITY means those activities listed in Chapter 125 of the Texas Civil Practice and Remedies Code, as amended. The term does not include crimes of family violence.

(2)    CHIEF OF POLICE OR CHIEF means the chief of the police department of the city or the chief's designee.

(3)    CPTED means crime prevention through environmental design and is a multi-disciplinary approach to reducing criminal behavior through environmental design by integrating the following concepts, among others, on property: natural surveillance that eliminates hiding places for people to engage in crime unnoticed; clear delineation of private space from public space; and controlled access onto private property.

(4)    HABITUAL CRIMINAL PROPERTY means a property that is described in Section 27-48(a) of this chapter, as amended.

(5)    OWNER means a person who has ownership or title of real property, including, but not limited to:

(i)    the holder of fee simple title;

(ii)    the holder of a life estate;

(iii)    the holder of a leasehold estate for an initial term of five years or more;

(iv)    the buyer in a contract for deed;

(v)    a mortgagee, receiver, executor, or trustee in control of real property; and

(vi)    the named grantee in the last recorded deed.

## SEC. 27-47.            AUTHORITY OF THE CHIEF OF POLICE.

The chief of police shall implement and enforce this article and may by written order establish such rules, regulations, or procedures, not inconsistent with this article, as the chief of police determines are necessary to discharge any duty under or to effect the purpose of this article.

## SEC. 27-48.            PRESUMPTIONS.

(a)    A property is presumed a habitual criminal property if the property is the site:

(1)     of five or more abatable criminal activities within 365 days resulting in either a report of a law enforcement agency documenting an investigation of an abatable criminal activity on the property or enforcement action against any person associated with the abatable criminal activity on the property; and

(2)     at which persons have historically committed abatable criminal activities, according to recent crime data.

(b)     An owner of a habitual criminal property is presumed to have knowingly tolerated the abatable criminal activity at the owner's property by failing to take reasonable steps, including those outlined in Section 27-49(b)(1) of this chapter, as amended, to abate the abatable criminal activity.

(c)     The presumptions in this section are rebuttable at the accord meeting pursuant to Section 27-49 of this chapter, as amended.

## SEC. 27-49.          ACCORD MEETING.

(a)     If the chief of police determines that the presumptions in Section 27-48 of this chapter, as amended, are satisfied, the chief shall notify the owner of the property, in writing, of the chief's preliminary determination and shall provide the owner with notice to attend an accord meeting.  The notice must include a copy of this article.

(b)     At the accord meeting, the following applies:

(1)     The presumed owner may present evidence that the person is not the owner or that the owner has taken reasonable steps to abate the abatable criminal activity, including, without limitation, that the:

(i)     owner has implemented CPTED principles at the property;

(ii)     owner has implemented monitoring and surveillance systems at the property;

(iii)     owner is in compliance with all regulations governing the owner's business;

(iv)     owner is enforcing lease clauses related to reducing abatable criminal activity, such as tenant screening, enforcement of property rules, and regular tenant verification;

(v)     owner is communicating abatable criminal activity to the chief and cooperating with the chief, as requested; and

(vi)     property is in compliance with the standards set out in this code.

(2)     The city attorney may attend the meeting as the chief's legal counsel and the owner may bring his or her legal counsel.

(c)     The chief shall make all reasonable efforts to schedule the accord meeting during a time when the owner is available but not later than 30 days from the date the accord meeting notice is deemed received or is actually received by the owner, whichever date is sooner.

(d)     Not later than 30 days after the date of the accord meeting, the chief shall provide the owner with notice of the chief's final determination as to the presumptions under Section 27-48 of this chapter, as amended.  Notwithstanding the foregoing, upon request of the owner during the accord meeting, the chief may delay the notice of determination up to 60 days after the accord meeting, during which time the owner may present additional evidence under Section 27-49(b)(1) of this chapter, as amended.  If the owner does not appear for the accord meeting, the chief's determination is final as of the date of the accord meeting provided in the notice.

(e)     An owner who is provided notice pursuant to this article commits an offense if the owner fails to attend an accord meeting.

## SEC. 27-50.     ANNUAL REVIEW.

Each year, not later than 30 days after the date the chief's determination as to the presumptions under Section 27-48 of this chapter, as amended, are final, the chief shall send a notice to the owner as to whether the presumptions under Section 27-48 of this chapter, as amended, are still satisfied.  The chief may, at any time, determine that the presumptions under Section 27-48 of this chapter, as amended, are no longer satisfied and shall then notify the owner of the chief's determination.

## SEC. 27-51.     APPEAL FROM CHIEF OF POLICE'S DETERMINATION.

(a)     The chief's determinations under Sections 27-49 and 27-50 of this chapter, as amended, are final unless the owner files a written appeal to the permit and license appeal board. The appeal must be filed with the city secretary not later than 10 calendar days after the date the owner receives notice of the chief's final determination.  A person who does not attend the accord meeting is not entitled to an appeal under this section for one year after the accord meeting date in the notice.  Only the owner is entitled to an appeal under this article.

(b)     If a written request for an appeal hearing is filed under Subsection (a) with the city secretary within the 10-day limit, the permit and license appeal board shall hear the appeal.  The city secretary shall set a date for the hearing not later than 30 days after the date the appeal is filed.

(c)     In deciding the appeal, the permit and license appeal board is limited to the issues of whether the presumptions in Section 27-48 of this chapter, as amended, are satisfied.

(d)     To the extent of a conflict between this article and Article IX, Chapter 2, of this code, this article controls.

## SEC. 27-52.                    PLACARDING; INSPECTIONS.

For a property that has been finally determined to satisfy the presumptions in Section 27-48 of this chapter, as amended, the following applies:

(1)     Placarding.  The chief may require the owner to place a placard on or near the front door or at any main entrance to the structure or dwelling unit.  For multitenant and commercial properties, the chief may also require the owner to place a placard in a conspicuous place in a common area of the property.

(A)     The placard must be visible at all times and must state the following:

"THE DALLAS POLICE DEPARTMENT HAS DECLARED THIS SITE A HABITUAL CRIMINAL PROPERTY UNDER ARTICLE VIII, CHAPTER 27, OF THE DALLAS CITY CODE.  IF YOU HAVE QUESTIONS, PLEASE CALL DPD AT [TELEPHONE NUMBER DETERMINED BY THE CHIEF].  IF YOU SEE SOMETHING SUSPICIOUS OCCURRING AT THIS PROPERTY OR IN AN EMERGENCY, DIAL 911."

(B)     A person commits an offense if the person, without authority from the chief, removes or destroys the placard.

(2)     Inspections.  The chief may inspect the property for compliance with the conditions and activities in Section 27-49(b)(1) of this chapter, as amended, or any other condition or activity the chief determines, in light of the chief's training and experience, will reduce abatable criminal activity at the property.

## SEC. 27-53.                    FEES.

For a property that has been finally determined to satisfy the presumptions in Section 27-48 of this chapter, as amended, the owner shall pay an annual fee to the city according to the table below for each year that the presumptions in Section 27-48 of this chapter, as amended, are satisfied.  In this section, residential and nonresidential refer to those uses as defined in the Dallas Development Code, as amended.  The fees are not refundable in whole or in part.

| **RESIDENTIAL** (by number of dwelling units) | **ANNUAL FEE** |
|---|---|
| 0-2 | $1,629 |
| 3-20 | $2,009 |
| 21-59 | $2,752 |
| 60-250 | $3,564 |
| 251-500 | $4,321 |
| 501-1,000 | $5,317 |
| 1,001 or more | $6,313 |

| **NONRESIDENTIAL** (by square footage of largest improvement) | **ANNUAL FEE** |
|---|---|
| 0-4,999 | $2,802 |
| 5,000-9,999 | $3,447 |
| 10,000-59,999 | $4,926 |
| 60,000-99,999 | $7,653 |
| 100,000 or more | $9,825 |

## SEC. 27-54.          DELIVERY OF NOTICES.

Any notice to be provided by the city pursuant to this article shall be deemed effective if made to the owner.  Notice is effective when:

      (1)    personally delivered to the owner; or

      (2)    mailed by certified U.S. mail, with return receipt requested, and addressed to the owner at the last address provided in the registration of the property under Article VII of this chapter, as amended, or, if the property is not subject to registration under this chapter, then to the last address in the central appraisal district records.  Mailed notice shall be deemed received

and effective three days after the date of mailing whether the notice was actually received or whether the notice was returned unclaimed or undeliverable."

SECTION 2.   That, unless specifically provided otherwise by this ordinance, the Dallas City Code, as amended, or by state law, a person violating a provision of this ordinance is, upon conviction, punishable by a fine not to exceed $500.

SECTION 3.   That Chapter 27 of the Dallas City Code shall remain in full force and effect, save and except as amended by this ordinance.

SECTION 4.   That any act done or right vested or accrued, or any proceeding, suit, or prosecution had or commenced in any action before the amendment or repeal of any ordinance, or part thereof, shall not be affected or impaired by amendment or repeal of any ordinance, or part thereof, and shall be treated as still remaining in full force and effect for all intents and purposes as if the amended or repealed ordinance, or part thereof, had remained in force.

SECTION 5.   That the terms and provisions of this ordinance are severable and are governed by Section 1-4 of Chapter 1 of the Dallas City Code, as amended.

SECTION 6.   That new Section 27-53, "Fees," of Article VIII, "Habitual Criminal Properties," of Chapter 27, "Minimum Property Standards," as stated in Section 1 of this ordinance shall take effect on February 1, 2018, and it is accordingly so ordained.

SECTION 7.   That all other amendments not specifically referenced in Section 6 of this ordinance shall take effect immediately from and after its passage and publication in accordance with the provisions of the Charter of the City of Dallas, and it is accordingly so ordained.

APPROVED AS TO FORM:

LARRY E. CASTO, City Attorney

By_____

          Assistant City Attorney

Passed_____DEC 1 3 2017_____

Exhibit B, p. 10



# PROOF OF PUBLICATION – LEGAL ADVERTISING

**The legal advertisement required for the noted ordinance was published in the Dallas Morning News, the official newspaper of the city, as required by law, and the Dallas City Charter, Chapter XVIII, Section 7.**

**DATE ADOPTED BY CITY COUNCIL** _____ DEC 1 3 2017 _____

**ORDINANCE NUMBER** _____ 30714 _____

**DATE PUBLISHED** _____ DEC 1 6 2017 _____

**ATTESTED BY:**

---

## HABITUAL CRIMINAL PROPERTY NOTICE

---



**City of Dallas**

April 26, 2021

Hoppenstein Properties, Inc.
P.O. Box 207
Waco, TX 76703
*Via CMRRR 7013 3020 0001 1409 4580*

c/o Norman Hoppenstein, President
3821 Matterhorn Dr.,
Plano, TX 75075
*Via CMRRR 7013 3020 0001 1409 4634*

**Re:     3308 Elsie Faye Heggins St., Dallas, TX 75215—Notice of Habitual Criminal Property Presumption, Mandatory Meeting Date, Annual Fee, and Required Placard**

Dear Hoppenstein Properties, Inc.:

This letter serves to notify you that your real property located at 3308 Elsie Faye Heggins, St., Dallas TX, City Block 4451 ACS 3.255 (hereinafter "Property") is a Habitual Criminal Property ("HCP"), as defined by Dallas City Code Section 27-48, due to repeated occurrences of abatable criminal activity at the Property. Please find attached a copy of the Habitual Criminal Properties provisions in the Dallas City Code. As detailed below, if you fail to provide evidence that you have implemented reasonable crime prevention measures at your Property, you will be assessed a fee and required to place a placard on your Property notifying the public of the HCP designation.

<u>Property:</u> 3308 Elsie Faye Heggins St., Dallas, Texas 75215
<u>Legal description:</u> City Block 4451 ACS 3.255
<u>Business(es) Operating at the Property:</u> Jackson Hewitt Tax Services; South Dallas Grill; Dollar Store Plus; Metro PCS; Hollywood Nail; Men's and Women's Wear; Total Fashion; Family Dollar Store Inc.; Smile Zone; Level Fashion 1; Ace Cash Express; Donuts 4 U; B&B Cuts & Styles.

<u>Notification of Abatable Criminal Activity</u>
Pursuant to Section 27-48(a) of the Dallas City Code, a property is presumed a Habitual Criminal Property if it is the site of five or more abatable criminal activities within 365 days resulting in either a report of a law enforcement agency documenting an investigation

April 26, 2021
Habitual Criminal Property Notice for 3308 Elsie Faye Heggins St., Dallas, TX 75215
Page 2

of an abatable criminal activity on the property or enforcement action against any person associated with the abatable criminal activity on the property; and at which persons have historically committed abatable criminal activities, according to recent crime data.

The following abatable criminal activity occurred at the Property within the past 365 days:

1. Possession of Marijuana >4oz (April 21, 2021 – #069012-2021);
2. Possession of Marijuana (March 29, 2021 – #053449-2021);
3. Deadly Conduct (March 13, 2021 – #043137-2021);
4. Robbery of Business (January 25, 2021 – #014828-2021);
5. Aggravated Assault, deadly weapon (October 31, 2020 – #194573-2020);
6. Criminal Mischief (October 22, 2020 – #188993-2020); and
7. Possession of a controlled substance (October 6, 2020 – 137926-2020).

Additionally, the following abatable criminal activity occurred at the Property within the previous two years:

1. Criminal Mischief (July 15, 2019 – #142806-2019);
2. Possession of Marijuana (July 26, 2019 – #150740-2019);
3. Disorderly Conduct (August 1, 2019 – #154999-2019);
4. Criminal Mischief (October 10, 2019 – #206832-2019);
5. Criminal Trespass (October 20, 2019 – #220057-2019); and
6. Criminal Mischief (December 19, 2019 – # 254432-2019).

You can review the criminal activity that has occurred at the Property in more detail at Dallaspolice.net or by making a written request to City of Dallas Open Records.

**Mandatory Meeting – Opportunity to Rebut Presumption**

The City is prepared to meet with you pursuant to Section 27-49 of the Dallas City Code at the date, time, and location detailed below. The purpose of this meeting is for you to present evidence of any reasonable steps you have already taken to reduce the abatable criminal activity occurring on the Property. If you fail to attend the accord meeting or fail to present sufficient evidence of reasonable measures that you have already implemented to abate the abatable criminal activity, you will be required to place placards on the Property notifying the public that it is a Habitual Criminal Property and to pay the annual fee outlined below.

**Meeting Date:** May 4, 2021 at 2:00 P.M.
**Meeting Location:** 5411 Bexar St., Dallas, TX 75215
**Annual Habitual Criminal Property Fee:** $4,926.00

**PLEASE NOTE THAT FAILURE OF THE OWNER TO ATTEND THE MANDATORY MEETING IS A CRIMINAL OFFENSE UNDER SECTION 27-49(e) OF THE DALLAS CITY CODE.**

April 26, 2021
Habitual Criminal Property Notice for 3308 Elsie Faye Heggins St., Dallas, TX 75215
Page 3

If you are unable to meet on the scheduled date, please immediately contact Detective Bernardo Bueno via email at bernardo.bueno2@dpd.ci.dallas.tx.us to request an alternative meeting date.

Only written requests for alternative meeting dates will be considered. Per the ordinance, the meeting must occur within 30 days of the date this notice is actually received by you, or is deemed received, whichever date is sooner.

Sincerely,

Chief of Police
Dallas Police Department

By: Richard Rivas                                    DATE  4/26/2021
Major of the Southeast Patrol Division
Dallas Police Department


ENCLOSURES:        Habitual Criminal Properties code provisions

## HABITUAL CRIMINAL PROPERTY NOTICE



**City of Dallas**



April 27, 2021

Hoppenstein Properties, Inc.
c/o Norman Hoppenstein
3821 Matterhorn Drive
Plano, TX 75075
*Via CMRRR:  7020 2450 0001 6596 8854*

Re:   **1207 E. Red Bird Lane, Dallas, TX 75241—Notice of Habitual Criminal Property Presumption, Mandatory Meeting Date, Annual Fee, and Required Placard**

To whom it may concern:

This letter serves to notify you that your real property located at 1207 E. Red Bird Ln., Dallas, TX 75241 (hereinafter "Property") is a Habitual Criminal Property ("HCP"), as defined by Dallas City Code Section 27-48, due to repeated occurrences of abatable criminal activity at the Property. Please find attached a copy of the Habitual Criminal Properties provisions in the Dallas City Code. As detailed below, if you fail to provide evidence that you have implemented reasonable crime prevention measures at your Property, you will be assessed a fee and required to place a placard on your Property notifying the public of the HCP designation.

**Property:** 1207 E. Red Bird Ln., Dallas, Texas 75216
**Legal description:** BLK 6899, TR 13 ACS 2.7310, NS REDBIRD TO HOUSTON SCHOOL RD, VOL96168/0986 DD082396 CO-DALLAS, 6899 000 01300 2006899 000
**Business(es) Operating at the Property:** Ruben's Grocery

**Notification of Abatable Criminal Activity**
Pursuant to Section 27-48(a) of the Dallas City Code, a property is presumed a Habitual Criminal Property if it is the site of five or more abatable criminal activities within 365 days resulting in either a report of a law enforcement agency documenting an investigation of an abatable criminal activity on the property or enforcement action against any person associated with the abatable criminal activity on the property; and at which persons have historically committed abatable criminal activities, according to recent crime data.

The following abatable criminal activity occurred at the Property within the past 365 days:

1. Criminal Trespass, 03/18/2020, 052770-2020

April 27, 2021
Habitual Criminal Property Notice for 1207 E Redbird Ln., Dallas, TX 75241
Page 2

2.  Robbery, 06/10/2020, 102489-2020
3.  Robbery, 06/10/2020, 103443-2020
4.  Disorderly Conduct, 07/30/2020, 133696-2020
5.  Possession of Controlled Substance, 08/01/2020, 134897-2020
6.  Possession of Marijuana, 08/15/2020, 144125-2020
7.  Unlawful Carrying of Weapon, 09/08/2020, 159811-2020
8.  Deadly Conduct/Discharge of Firearm, 10/22/2020, 188626-2020
9.  Criminal Trespass, 12/07/2020, 218832-2020
10. Possession of Controlled Substance, 02/06/2021, 022526-2021
11. Possession of Controlled Substance, 02/27/2021, 034097-2021
12. Criminal Trespass, 02/28/2021, 034601-2021
13. Possession of Marijuana, 03/09/2021, 040510-2021

You can review the criminal activity that has occurred at the Property in more detail at
Dallaspolice.net or by making a written request to City of Dallas Open Records.

### Mandatory Meeting – Opportunity to Rebut Presumption

The City is prepared to meet with you pursuant to Section 27-49 of the Dallas City Code
at the date, time, and location detailed below.  The purpose of this meeting is for you to
present evidence of any reasonable steps you have already taken to reduce the abatable
criminal activity occurring on the Property. If you fail to attend the accord meeting or fail
to present any evidence of reasonable measures that you have already implemented to abate
the abatable criminal activity, you will be required to place placards on the Property
notifying the public that it is a Habitual Criminal Property and to pay the annual fee
outlined below.

**Meeting Date:** May 11, 2021, at 1:00pm via virtual meeting (please contact me *before* the
listed date to confirm virtual meeting login credentials)
**Annual Habitual Criminal Property Fee:** $2,802

**PLEASE NOTE THAT FAILURE OF THE OWNER TO ATTEND THE
MANDATORY MEETING IS A CRIMINAL OFFENSE UNDER SECTION 27-
49(e) OF THE DALLAS CITY CODE.**

Please contact Assistant City Attorney Edward Brookins via email at
Edward.Brookins@dallascityhall.com or by phone at 214-952-9135 to confirm a time for
the meeting or to request an alternative meeting date.

Only written requests for alternative meeting dates will be considered. Per the ordinance,
the meeting must occur within 30 days of the date this notice is actually received by you,
or is deemed received, whichever date is sooner.

April 27, 2021
Habitual Criminal Property Notice for 1207 E Redbird Ln., Dallas, TX 75241
Page 3


Sincerely,
Eddie Garcia
Chief of Police
Dallas Police Department


By: Major David Davis                    April 21, 2021
Major of the South Central Division      DATE
Dallas Police Department

5th Court of Appeals
FILED: 7-01-19
Lisa Matz, Clerk

# In The Court of Appeals
# Fifth District of Texas at Dallas

_____

## No. 05-19-00775-CV

_____

### FREDDY DAVENPORT d/b/a/ JIM'S CARWASH
### and DALE DAVENPORT, Appellants

### V.

### CITY OF DALLAS, Appellee

On Appeal from the 14th Judicial District Court
Dallas County, Texas
Trial Court Cause No. DC-19-04899

## APPELLANTS' EMERGENCY MOTION TO
## SUSPEND TEMPORARY INJUNCTION

Warren V. Norred, P.E.
State Bar No. 24045094
NORRED LAW, PLLC
515 East Border Street
Arlington, Texas 76010
817-704-3984 office
817-524-6686 fax
wnorred@norredlaw.com

Kristen Monkhouse
Assistant City Attorney
State Bar No. 24092853
Andrew M. Gilbert
Senior Assistant City Attorney
State Bar No. 24012696
CITY ATTORNEY'S OFFICE
1500 Marilla Street, Room 7D North
Dallas, Texas 75201
214-0670-3519 office
214-670-0622 fax

**ATTORNEY FOR APPELLANTS**

**ATTORNEYS FOR APPELLEE**

# I.   <u>SUMMARY OF MOTION & RELIEF SOUGHT</u>

1.      The Appellants seek emergency relief from a temporary injunction order filed on June 24, 2019 in the 14 Judicial District Court requiring Appellants to hire and maintain two certified peace officers to patrol the premises of Appellants property at all time and on all days of the week. *See Exhibit A.*

2.      The requirements of the Temporary Injunction Order exceed the remedies sought in the Appellee's Original Petition to the Trial Court, as well as those discussed and requested at the hearing on said Temporary Injunction. Because Appellants cannot fund the $36,000 a month for two security guards required by the order, and a coin-op car wash cannot begin to pay for that level of security, even the ownership of the property is unfeasible, and operation of the business impossible, rendering the Temporary Injunction equivalent to a deliberate taking.

3.      By this motion, Appellants request that this Court stay the effect of the Temporary Injunction Order with regard to the hiring of peace officers for patrol duties, either without the necessity of a bond under TRAP 29.1 and 29.2 or with an appropriate bond amount under TRAP 29.3.

4.      Appellants filed a motion June 27, 2019, requesting that the trial court set a bond for security. However, the trial court can set the motion for hearing no earlier than July 12, 2019, which is equivalent to a denial until that time, leading to this request for relief.

## II.   <u>FACTS</u>

5.     Due to the trial court's initial restraining order, issued in spite of its reliance on outdated law and misstatements, the subject property and the coin-operated car wash on the property have been closed to the public since June 6, 2019.

6.     Several security cameras are in place on the property and additional fencing is planned to further discourage trespassers.

7.     Appellants monitor the property to ensure that it remains secure. Appellants have cooperated with police by submitting to them a criminal trespass affidavit.

8.     Dallas police is currently monitoring the property by live video.

9.     Appellants have complied to the fullest of their ability with the Trial Court's Temporary Restraining Order issued on June 20, 2019. *See **Exhibit B.***

10.    During the hearing for the City's application for temporary injunction, no witness stated any crime had occurred on the property since it ceased operations under the conditions of the restraining order.

11.    Despite this compliance, the requirements of the Trial Court's Temporary Injunction were substantially more severe than those of the Temporary Restraining Order issued two weeks prior.

12.     Compliance with the Trial Court's Temporary Injunction would cost Appellants $36,000 *each month* at the very minimum. This, despite the fact that the property is not open, hosting no crime, and cannot be said to be a nuisance.

13.     Even if the property was still generating revenue, Appellants simply would not have access to financial resources equal to the cost of complying with the Temporary Injunction. Said Temporary Injunction is therefore little other than a means to later support an order of sanctions and loss of bond that Appellants have no material way to avoid, eventually leading to a taking of the property by the City.

14.     Appellants have moved the trial court to set a bond pursuant to Rule 29.2 of the Texas Rules of Appellant Procedure, but the City opposed the motion, and there is no expectation that the trial court will grant the requested motion.

15.     The trial court has informed the undersigned that no hearing on the request to set security will be heard until July 12, 2019, two weeks from this filing, and no other court is allowed to hear the motion to set a bond

16.     Appellants cannot afford $2640 each day for security until July 12th, and Appellants cannot wait for the trial court to deny the motion, and seek immediate relief from the temporary injunction.

17.     Appellants are posting a $5,000 bond as required by the Temporary Injunction no later than July 1, 2019, which may also serve to satisfy a security bond as this Court may require.

## III.   <u>ARGUMENTS & AUTHORITIES</u>

18.    TRAP 29.3 provides as follows:

> When an appeal from an interlocutory order is perfected, the appellate court may make any temporary orders necessary to preserve the parties' rights until disposition of the appeal and may require appropriate security. But the appellate court must not suspend the trial court's order if the appellant's rights would be adequately protected by supersedeas or another order made under Rule 24.

Thus, this Court has the authority to grant this motion and can require a supersedeas bond.

19.    An order staying the effect of the trial court's temporary injunction order is the only way to preserve Appellants' rights.

20.    TRAP 29.3 further provides that "[i]f the trial court refuses to permit the appellant to supersede the order, the appellant may move the appellate court to review that decision for abuse of discretion." A refusal or severely delayed hearing is tantamount to a denial to set a bond.

21.    It should also be noted that Section 125.003(c) contemplates staying the effect of a temporary injunctive order pending an appeal. Section 125.003(c) provides that "[a] person may not continue the enjoined activity pending appeal or trial on the merits of an injunctive order entered in a suit brought under this subchapter." CPRC § 125.003(c). An "injunctive order entered in a suit brought under this subchapter" can only include the final injunctive relief permitted under Section 125.002(e), which is the only injunctive relief included in Subchapter A.

The "temporary injunctive order" referenced in the last part of Section 125.003(c), however, is only found in Subchapter C. Thus, nothing in Chapter 125 prevents the staying of the effect of a *temporary* injunctive order pending an appeal.

22.   Based on the foregoing, the Appellants respectfully request that this Court stay the temporary injunction order, either without the necessity of a bond under TRAP 29.1 and 29.2 or with an appropriate bond amount under TRAP 29.3.

## IV.   <u>PRAYER</u>

WHEREFORE, considering the foregoing, the Appellants respectfully pray that this Court grant Appellant's Motion and stay the effect of the June 24, 2019 Temporary Injunction Order until disposition of this interlocutory appeal. The Appellants additionally pray for such other relief, whether at law or in equity, including all costs of court, to the Appellants may be justly entitled.

Respectfully submitted,

By: */s/ Warren V. Norred*
Warren V. Norred, P.E.; State Bar No. 24045094
NORRED LAW, PLLC
515 East Border Street; Arlington, Texas 76010
817-704-3984 office; 817-524-6686 fax
wnorred@norredlaw.com
**ATTORNEY FOR APPELLANTS**


Exhibits
A: Temporary Injunction
B: Temporary Restraining Order

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2019, a true and correct copy of the foregoing was forwarded via the court's efile system to all parties seeking electronic service in the above-named case.

*/s/ Warren V. Norred*
Warren V. Norred, P.E.

## DECLARATION OF WARREN V. NORRED

1.      My name is Warren V. Norred. I am more than twenty-one years of age, of sound mind, and otherwise competent to make this declaration. I drafted the above motion and have personal knowledge of the facts in this declaration, specifically paragraphs 1 to 17, and all statements contained herein are true, correct, and made under penalty of perjury.

2.      I am an attorney at law duly licensed to practice law in the State of Texas, the Fifth Circuit, and the United States Supreme Court. I am principal of the law firm of Norred Law, PLLC, and counsel of record for defendants in this matter.

3.      I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct.

Executed this June 29, 2019, in Arlington, Texas.

  /s/ Warren V. Norred
Warren V. Norred

CAUSE NO. DC-19-08101

| | | |
|---|---|---|
| CITY OF DALLAS, | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| FREDDY DAVENPORT, | § | DALLAS COUNTY, TEXAS |
| DALE DAVENPORT, | § | |
| and 2702 MARTIN LUTHER KING | § | |
| JR. BLVD., DALLAS, TEXAS, | § | |
| *in rem*, | § | |
| Defendants. | § | 14th JUDICIAL DISTRICT |

## TEMPORARY RESTRAINING ORDER

ON THIS DAY, came to be heard the City of Dallas's Request Verified Application for Temporary Restraining Order. Kristen Monkhouse and Andrew Gilbert, attorneys for City of Dallas, appeared in person. Defendants, Freddy Davenport, Dale Davenport, and 2702 Martin Luther King Jr. Blvd., Dallas, Texas, *in rem* (collectively, "Defendants") did appear, through their counsel, Warren Norred.

City of Dallas, Plaintiff in this cause, has filed a verified petition for temporary and permanent injunction with supporting affidavits and, in connection therewith, has presented a request for a temporary restraining order, as set forth in *City of Dallas's Original Petition and Verified Application for Temporary Restraining Order and Temporary and Permanent Injunction* ("City's Petition").

It clearly appears from the facts set forth in the City's Petition that Defendants are knowingly tolerating and maintaining a common nuisance as defined in Chapter 125 of the Texas Civil Practice and Remedies Code at the real property located at Block 21/1290 and commonly known as 2702 Martin Luther King Jr. Blvd., Dallas, Texas upon which is a self-service car wash facility named Jim's Car Wash (the "Property"). Specifically, the Property is a place to which

TEMPORARY RESTRAINING ORDER                                                                                    1

*inter alia*

persons habitually go to commit crimes of possession of marijuana, unlawful possession of a firearm, aggravated robbery, and murder.  The City has previously sued and obtained permanent injunction and judgment against Freddy Davenport concerning this Property under Chapter 125 of the Texas Civil Practice and Remedies Code for knowingly tolerating habitual criminal activity on the Property, not taking reasonable steps to abate the criminal activity, and maintaining the Property as a common nuisance.  Currently, Defendants have failed to take reasonable steps to abate the habitual criminal activity on the Property that continues to this day.

**IT IS THEREFORE ORDERED** that Defendants, including their employees, servants, contractors, successors, assignees, and any persons in active concert of active participation with Defendants, are enjoined from maintaining the Property as a common nuisance, specifically, as a place to which persons go to commit crimes of possession of marijuana, unlawful possession of a firearm, aggravated robbery, and murder.

**IT IS FURTHER ORDERED** that Defendants shall immediately do the following to help abate the common nuisance at the Property:

a. Hire a minimum of two certified peace officers to patrol the Property together, for 24 hours per day, seven days a week, during the pendency of this order;

b. Limit the hours of operation of the car wash business to the time between 7:00a.m. and 9:00p.m. daily, install and maintain signage that states such hours of operation, and ensure the Property is not occupied outside of business hours;

c. Limit the amount of time that any individual customer is permitted on the Property to one (1) hour;

d. Maintain all security lighting;

e. Submit a criminal trespass affidavit to the City no later than 5:00p.m. on June 7, 2019, and require security officers to enforce criminal trespass law during business and non-business hours to prohibit anyone from loitering on the Property;

f. Alternatively, in the event that Defendants close the business on the Property, Defendants are ordered to post and maintain barricades for all points of ingress and egress on the Property and are required to maintain security patrol on the Property on a regular basis to be sure that the Property is secured and not being trespassed upon.

**IT IS FURTHER ORDERED** that the clerk shall issue notice to Defendants of the hearing on the City's application for temporary injunction. The purpose of this hearing shall be to determine whether this temporary restraining order along with any other possible measures should be made a temporary injunction pending full trial.

No bond is necessary to be posted by Plaintiff, the City of Dallas.

This order expires ~~on~~ _Pursuant To The Tx R. Civ. P_____ and the hearing on the City's application for temporary injunction is set for the ___20___ day of ___June___, 2019 at ___1___ _P_.m. in the ___17th___ Court.

Signed on ___6 Q___, 2019 at ___2 to___ ~~a.m.~~/p.m.

PRESIDING JUDGE

Cause No. DC-19-04899

| | | |
|---|---|---|
| FREDDY DAVENPORT, et al | § | IN THE DISTRICT COURT |
| Plaintiffs, | § | |
| | § | |
| v. | § | 14TH JUDICIAL DISTRICT |
| | § | |
| | § | |
| CITY OF DALLAS, et al | § | |
| Defendants. | § | DALLAS COUNTY, TEXAS |

## **TEMPORARY INJUNCTION**

ON THIS DAY, came to be heard the City of Dallas's Request for Temporary Injunction against Counter-Defendants, Freddy Davenport d/b/a Jim's Car Wash, Dale Davenport, and 2702 Martin Luther King Jr. Blvd., Dallas, Texas, *in rem* (collectively, "Defendants"). Plaintiff, the City of Dallas (the "City") appeared before this Court. Defendants were properly served with notice of this hearing and did appear. Upon consideration of the pleadings, evidence presented, and the arguments of the parties, the Court finds good cause to enter this Temporary Injunction.

Further, the Court hereby finds the following:

The City of Dallas is a home-rule municipal corporation situated mainly in Dallas County, Texas, incorporated and operating under the laws of the State of Texas.

Venue is proper and this Court has jurisdiction pursuant to Section 125.002 of the Texas Civil Practice and Remedies Code.

Defendants, Freddy Davenport and Dale Davenport, are individuals owning and controlling the real property located at Block 21/1290, and commonly known as 2702 Martin Luther King Jr. Blvd., Dallas, Texas, *in rem* (the "Property"), also known as Jim's Car Wash (the "Property").

The Property consists of a self-service car wash that is located in the Southeast area of the City.

The preponderance of the evidence from this hearing shows that the Property is a place to which persons habitually go to commit crimes such as possession/manufacture/delivery of controlled substances, unlawfully carrying a weapon, aggravated assault, ▓▓▓r, criminal trespass, and disorderly conduct. Further, the evidence shows that the owners of the Property, Defendants Freddy Davenport and Dale Davenport, knowingly tolerate the criminal activity on the Property and knowingly maintain the Property as a common nuisance.

In addition, the Court finds that Defendants failed to comply with the Court's temporary restraining order issued June 6, 2019. Defendants failed to hire certified peace officers to patrol the Property, did not limit the hours of the business on the Property, and did not limit the amount of time customers could remain on the Property. Although the business is now closed, Defendants failed to post and maintain barricades as ordered and failed to hire security as ordered under the temporary restraining order.

This Temporary Injunction is necessary to protect the citizens of Dallas from the harm that would occur in its absence, namely the habitual occurrence of abatable crimes at the Property.

**IT IS THEREFORE ORDERED** that Defendants, their guests, agents, employees, assigns, successors in interest, and any other persons in privity with Defendants shall immediately cease and desist from maintaining the Property as a common nuisance.

**IT IS FURTHER ORDERED** that Defendants, their guests, agents, employees, assigns, successors in interest, and any other persons in privity with Defendants shall take the following additional actions to abate the common nuisance on the Property pursuant to Section 125.045 of the Texas Civil Practice and Remedies Code:

    a. Hire a minimum of two certified peace officers to patrol the Property together, for 24 hours per day, seven days a week, during the pendency of this order;

b.  Limit the hours of operation of the car wash business to the time between 7:00a.m. and 9:00p.m. daily, install and maintain signage that states such hours of operation, and ensure the Property is not occupied outside of business hours;

c.  Limit the amount of time that any individual customer is permitted on the Property to one (1) hour;

d.  Maintain all security lighting;

e.  In the alternative, if Defendants close the business on the Property, Defendants are ordered to post and maintain barricades sufficient to prevent trespassing for all points of ingress and egress on the Property and are required to maintain a minimum of two certified peace officers to patrol the Property together, for 24 hours per day, seven days a week, to be sure that the Property is secured and not being trespassed upon.

**IT IS FURTHER ORDERED** that Defendants shall provide notice of this Temporary Injunction to any subsequent holder, successor in interest, purchaser, or owner, and inform such subsequent holder, successor in interest, purchaser, or owner that he or she shall be bound by the terms and conditions contained within this Temporary Injunction.

**IT IS THEREFORE ORDERED** that Defendants shall execute a bond in the amount of $ 500 __ (no less than $5,000, not more than $10,000).  Said bond is ordered pursuant to Section 125.045(a) of the Texas Civil Practice and Remedies Code.  The bond shall be made payable to the State of Texas at the City of Dallas, Texas, and shall have sufficient sureties approved by the Court.  Further, the bond shall be conditioned that Defendants will not knowingly maintain a Common Nuisance on the Property. This Bond shall be posted within __7__ days after the Court signs this Injunction.

TEMPORARY INJUNCTION                                                                 3

No bond is required to be posted by Plaintiff, City of Dallas.

The *Permanent Injunction Hearing and Full Trial on the Merits* is set for _31 March_ _____, ~~2019~~ 2020 at _9:30_ (a.m)/p.m. in the 1~~00~~th Judicial District Court of Dallas County, Texas.

Signed this _25_ day of _____, 2019.

_____
PRESIDING JUDGE

**Order entered July 1, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-19-00775-CV

**FREDDY DAVENPORT D/B/A JIM'S CARWASH AND DALE DAVENPORT,**
**Appellants**

**V.**

**CITY OF DALLAS, ET AL., Appellees**

**On Appeal from the 14th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-19-04899**

# ORDER

Before Justices Bridges, Osborne, and Carlyle

Before the Court is appellants' July 1, 2019 emergency motion to suspend temporary injunction. In the motion, appellants request the Court to stay the trial court's June 24, 2019 temporary injunction order pending disposition of this interlocutory appeal. Appellants' motion is **GRANTED** to the extent we **STAY** only the following italicized portion of the trial court's June 24, 2019 temporary injunction order:

> c. Alternatively, in the event that Defendants close the business on the Property, Defendants are ordered to post and maintain barricades for all points of ingress and egress on the Property and are required to maintain a minimum of two certified peace officers to patrol the property together, *for 24 hours per day, seven days a*

*week*, to be sure that the Property is secured and not being trespassed upon.

pending resolution of appellants' June 27, 2019 motion to set a security bond in the trial court. The parties shall timely notify this Court of the trial court's resolution of the motion to set a security bond in the trial court.

The Dallas County District Clerk is **ORDERED** to file a supplemental clerk's record containing a copy of the trial court's order on the motion to set security within **TEN DAYS** after the trial court rules on the motion.

/s/    DAVID L. BRIDGES
        JUSTICE

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS - DALLAS DIVISION

| | | |
|---|---|---|
| **HOPPENSTEIN PROPERTIES, INC.** | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | Civ. Action No. _____ |
| | § | |
| **CITY OF DALLAS and EDDIE** | § | |
| **GARCIA, in his official capacity as** | § | |
| **Chief of Police,** | § | |
| *Defendants.* | § | |

## <u>ORDER</u>

On this day, the Court considered Plaintiff Hoppenstein Properties, Inc.'s request for a temporary restraining order. Having considered the Plaintiff's request, this Court is of the opinion that it should be **GRANTED**, as Dallas City Council's Ordinance No. 30714 has created an unconstitutionally vague process that infringes Plaintiff's rights, damaging it by subjecting it and its owner to potentially criminal charges without due process. The Court **ORDERS** Defendants to desist use of Ordinance No. 30714 against Plaintiffs, contingent on Plaintiff's filing of a $100 bond with the Court. It is further **ORDERED** that this Temporary Restraining Order shall expire 14 days from issuance unless it is extended.

Plaintiff's Application for Temporary Injunction will be heard on June _____, 2021 at _____ a.m./p.m. before this Court unless otherwise notified.

Signed this _____ day of June, 2021.

_____
U.S. District Judge